If the result of this case, were to depend upon the decision of that question, it appears to me that it would be somewhat difficult for the do'endanis to maintain their ground. Their witnesses, what profess to be very well acquainted with his property in England,) and the amount of his debts, have sworn very confidentially that it Was encumbered to its full value. And that there were also many other unsatisfied demands against him. And this testimony is cor. roborated by a list of executions, to the amount of about seventy thousand pounds sterling, or three hundred thousand dollars. But what furnishes most unequivocal evidence of the fact, is the letters of Admiral Graves himself, by which it appears, that he was actu. ally exiled from his native country, by his creditors ; and was dependent on the complainant for several years for his daily bread. That he could not pass through London in pursuit of a passage io> this country, except under an assumed name, for fear of an arrest in transitu. And that his wife was reduced to the necessity of pawning her jewels, and even her wearing apparel, to obtain th® necessary means of subsistence. And that finally, he was so sensi. hie of his utter inability to meet the complainant’s demands, that he referred him to his estate in South Carolina, as his only resource for . payment. There is, therefore, reason to believe, that if the question depended on the insolvency of the defendant, that the com* *234 plainants would be entitled to relief. I do not, however, consider the case as depending on that question. The only case which I have found in support of such a position, is the case of Lush vs. Wilkinson, 5 Ves. 384, where Lord Alvanly observes, that “ a sin* gle debt will not do. Every man must be indebted for the common bills of his house, though he pays them every week. It must depend upon this, whether he was in insolvent circumstances at the time.” In the case of Ily and Nusvrarger, 1 M'Cord’s Chancery, the doctrine is examined, and the cases referred to, where it will appear, that any considerable indebtedness beyond the current expenses of one’s family, is sufficient to render a voluntary deed void against antecedent creditors.
Mr. Atherly, who in his Treatise on Marriage Settlements, has; examined the subject with great care, goes farther. He holds'that any indebtedness, however small, will be sufficient"^ avoid a. voluntary deed. lie says, “ it is absurd to make the amount of the' debt, the criterion by which to judge of the fraudulency, or bona fieles of the settlement.” Atherly 217. But 1 am not prepared to go all that length, notwithstanding the confidence with which that writer delivers himself. There can be no pretence for saying, that a man of ample fortune, may not secure a reasonable portion for the support of a wife, or the advancement of a-child, merely •because be happen to be indebted at the time, for his ordinary fa* mily expenses. Debts of that description furnish no evidence of fraud. Mr. Atherly-admits, that he has not met with any direct information on the point. Lord Hardwicke, in the case of Rupel and Hammond, 1 At. 15-, does indeed say “ he took it that a per. son actually indebted, and conveying voluntarily, always meant to defraud his creditors.” Similar expressions, have fallen from him on other occasions ; and other judges also have made the same remark. But I do not think, that we are to infer from those general-observations, that the “ common bills of a man’s house,” would not form an exception. Mr. Atherly seems to think that tho- difficulty of drawing the line, is an unanswerable objection to such aquahfica* tion of the rule. It does not appear to me, however, that that objection is insurmountable. For although the line cannot be drawn with mathematical precision, I think it may be made sufficiently distinct for all practical purposes. And I believe that by examining the decisions of this State, it will be found, that they have always allowed that exception.
But the question is not necessarily involved in this case, and-therefore heed not be decided. lor according to any rule, by which *235 our decisions have hitherto been governed, the indebtedness' was sufficient to avoid this deed. I do not, however, consider this as a very important point in the case. For the deed was in any court good as between Admiral Graves and his son. And the debt in this case, was equally the debt of both. And that brings me to the consideration of the second question, to wit, the validity of the deed, or pretended marriage settlement of S. C. Graves. That deed embraced the Barony which had been conveyed to him for the nominal supi of four hundred thousand dollars, and also three hundred negroes, the most of which belonged to his father, and to which he had no right, and which were probably worth at that time one hundred and fifty thousand dollars, — making an aggregate of five hundred and fifty thousand dollars; and embracing all the property that either he or his father owned in this country. He was at that time indebted to the complainants, it is said, about forty thousand ■ dollars, and to Vandersmissen, about twenty-five thousand, besides his other debts, the amount of which is not ascertained. It also appears, that he was not less embarrassed in England, than his father. This case, therefore, comes clearly within the principles of the cases already considered, except that the deed professes to be made in consideration of marriage, which is said to be equivalent to a pecuniary consideration. It becomes necessary, therefore, to look a little further into the circumstances of the case, to see how far they are calculated to give character to the transaction. It appears, that Miss M‘Pherson, after-wards Mrs. Graves, and now Mrs. Cleary, had a very ample fortune of her own, which was settled upon her. So that there was no necessity for any further provision for her. And in addition to that, is made the further provision of more than half a million of dollars, — an estáte of itself equalled by very few in this country. And the question now is, whether a person largely in debt, can be permitted to pay off the whole by a single stroke of the pen ; by transferring all his property to an intended wife, under the name of a marriage settlement. Atherly 151. Brown vs. Carter, 5 Ves. 862. Brown vs. Jones, 1 At. 150. Nairn vs. Prowse, 6 Ves. 752. I agree that it is now settled beyond all controversy, that marriage is a good consideration,’ and I am not disposed to contro. vert the doctrine; yet there is no subject, perhaps, on which the English decisions ought to be received with more caution. Marriage settlements in that country, are usually amongst the wealthy, or higher classes of society only ; with whom, a marriage contract is in the nature of a bargain and sale — in which the marriage is the con *236 sideration on the one hand, and the settlement on the other. The. treaty is usually carried on by the parents or guardians, in which the inclination Df the contracting parties are never consulted. Family wealth and family pride, alone are to be promoted. It is in evidence that the marriage contract between Admiral Graves and his wife, tools place before they had ever seen each other. We have not yet arrived at that high degr.ee of refinement in this country. And I am inclined to think it desirable, that such á state of things should still be far distant from us. it may arise from the prejudice of education, but there is certainly something very repulsive in the idea, of a parent bartering off an amiable and accomplished daughter, for lands and negroes, as he would sell a lamb for the shambles. Yet these are the contracts, on which arc bottomed the true theory of marriage settlements. Nevertheless, 1 do not know that there is any thing in the general principles of the English decisions on this subject, to which I am unwilling to yield my assent. There is one marina, (though I believe, oftener used in this State than any where else,) “ that marriage is the highest consideration known to the law of the correctness of which I have some doubts. 1 think it at least questionable, whether tona fide creditors are not entitled to the first consideration. But be that as it may, I am not aware of any case, either in England or this country, where the settlement of the whole of a man’s property has been maintained against the claims of existing creditors. Such an inference has been attempted to be drawn from some equivocal expressions in the ease of Nairn and Prowse 6 Vesey 752. But the case does not authorize such a conclusion ; neither does the-case of Tunno and Trezevant, second Equity Reports, 264, which has been relied on for the same purpose. In that case a merchant, apparently in prosperous circumstances, made over the whole of a small patrimonial estate, (charged, however, wish a considerable debt,) by way of marriage settlement. He did not touch the co-partnership funds. The house afterwards failed, and this was an attempt by one oí the partnership creditors, to subject the private-property contained in the marriage settlement to the payment of his debt. But the court held it good against that claim, although an existing debt at the time. And that is as far as any case has gone, and perhaps as far as any case ought to go. But there is no case, that I have seen, where a man has been permitted to make an in» tended wife a mere stock to graft his property upon, in order to place it above the reach of his creditors. A marriage settlement roust be construed like every other instrument. The question may *237 always be raised, whether it was made with good faith, or intended as an instrument of fraud. Even though marriage may be a part of the consideration, fraud may be mingled with it; and that may as well be inferred from internal evidence, as from circumstances-aliundi. C 11 any one believe, that a man largely in debt, would make over the whole of his property, particularly an immense estate like this, to a woman of an ample estate of her own, with any other view ?
Marriage is put on the footing of a pecuniary consideration. And it is said if a person sell his property for á full consideration, and squander the money, his creditors have no redress. From whence, it is inferred that marriage will afford the same protection. But in the case of a bona fide sale, the seller has parted with his property, the purchaser has parted with his money, and the law will presume that the object was the payment of his debts. But the purchaser is not answerable for the misapplication of the money: It is not so with a marriage settlement. The seller does not in fact part with his property. It is still intended for his own enjoyment. Neither does he receive in return any thing that will satisfy his creditors. His wife will not be received in payment of his debts. It is not to be understood, that because marriage is equivalent to a pecuniary consideration, it is to be considered in the nature of an actual purchase. A settlement is not intended as the price of the wife, but as a provision for a family. It must, therefore, be reasonable, and with a due regard to the rights of others, A creditor has an equitable claim to the property of his debtor. And it is on that ground, that voluntary settlements are considered as fraudulent. And even where a pecuniary consideration is paid, if it be grossly inadequate, the settlement will be set aside in favor of creditors. It may indeed stand as a security for the sura actually advanced, where the purchaser is not a party to the fraud. The same principle applies in eases of post nuptial settlements. Lord Eldon says, “ if a purchase by the wife be bona fide, it is of no consequence whether it be before or after marriage.” 10 Ves. 144. And Lord Talbot observed, “ that inadequacy of consideration in settlements after marriage, was not to be strictly enquired into.” Lord Hale also is reported to have said, “ that in family agreements, the court did not nicely estimate the value of estates; but only whether it was a fair and honest agreement.” 1 Atk. 189. Yet in the case of Ward and Shallet, 2 Ves. 16, Lord Kardwicke held, that “ where the settlement vastly exceeded the consideration, the law would presumo that collusion or fraud was intended on the *238 creditors.” And in the ease of Dolen and Coíteman, 1 Ven. 294, the settlement was set aside on that ground. Atherly, 166, 171,201.
Now, although we have not the same criterion by which to judge of the reasonableness of a settlement made in consideration of marriage, as of one founded on a pecuniary consideration ; although we cannot estimate a marriage contract in dollars and cents, as we can the value of property ; yet we have some idea of what would constitute a comfortable provision for a family, at the commencement of a married life. And in forming a judgment of the bonaJides of the transaction, we may look to the value of a man’s property, the amount of his debts, the general state of his, and the value of the wife’s, property. And if the provision be found greatly disproportionate to his means, having relation to all those circumstances, it cannot fail to excite a suspicion of fraud. It is true, that all these do not furnish any certain rule by which the judgment can be directed. Neither have we any certain rule by which to estimate the damages sustained by an assault and battery, or slander. Or what is more directly in point, by a criminal coil-nection with a man’s wife.
Yet these considerations furnish no reason why no damages should be given, or why we should exercise no discretion as to the amount. But I am prepared to lay down one rule, in the execution of which, there will be no difficulty. That is, that wherever a person settles the whole of his property, the very fact of his including the whole, shall be considered, of itself, as conclusive evidence of fraud upon nis creditors. It is true 1 have not found any particular case which goes to authorise that position. But I think, that from the general principles of law, as well as from the analogy of the cases which l have considered, I have a right to draw from them such a conclusion. But in addition to that circumstance, the immensity of the estate settled, in this case, which is so far beyond the humble views of the people of this country, and the fact of his having included a large property of his father, to which he had no right, furnish evidence of actual fraud, which it is difficult to resist. I am of opinion, therefore, that although marriage is a good consideration, and that a settlement founded on such a consideration, may prevail even against creditors, it is not necessarily so under all circumstances, and to any extent ; and that the reasonableness of it may as well be enquired into, as the adequacy of price in a case of pecuniary consideration.
It, however appears, that about ten thousand dollars of the pro- *239 petty of the wife went into tho haiids of the husband, after tho marriage', which was not included in the marriage settlement. And, although, there is no direct proof that this was paid in consideration of the settlement, yet as it is in proof, that some settlement of his own property would have been required, if he had not voluntarily made the offer, it is fair to presume that it was suffered to pass in silence, in consideration of the ample provision which he had made. I think, therefore, that the land ought to stand chai ged with the repayment of that sum. I also think, that as the complainant’s demand was as well the debt oí Admiral Graves, as of his son, S. C. Graves, the negroes which were exclusively his property, ought first to be subjected to the payment of it, before the settlement should be disturbed.
A ground has been taken, which, perhaps, is entitled to some consideration. It is said, that if tho deed to tí. G. Graves be set aside, as fraudulent, the land devolved again upon Mrs. Graves. And that as her son died before her, the land, upon her death, descended to her grand daughter, and was not liable for the debts of either her husband or son. To that it is a sufficient answer to say, that although the deed may bo fraudulent, as it legards creditors, it is good as between Mrs, Graves and her son, to whom she had renounced her inheritance, and thereby made it liable to his debts.
The next question lor our consideration, is that of priority between the complainants and the Baron Yandersmisseu, the son-in-law of Admit al Graves. From the principles which have been already laid down, it follows that a reasonable provision for a family, made in consideration of marriage, when unattended with any circumstances of lraud, will prevail even against antecedent creditors. But this rule applies only to settlements made before marriage, or those subsequently made in pursuance of articles previously entered into. The question must, therefore, depend upon the character of the settlement now under consideration. It may, indeed, be important to observe, that the real estate, in question, was the property of Mrs. Graves, and therefore not liable for the debts of the Ad. miral. The personal estate, (which consisted of slaves,) was, exclusively, his own. In the year 1815, Admiral Graves and his wife, executed a deed of trust to General C. C. Pinckney and otliers, as trustees, for such uses and purposes as they (Admiral Graves' and wile,) should, at any future period appoint, with a power of revocation, and to make such other appointments as they, from time to time, or at any time thereafter, should think proper to make ; and until such appointment, then to the use of Admiral Graves and *240 wife, for their lives, with various limitations over to bis soil aña daughters, and their issue, <fcc. according to the various contingencies therein provided for, in the usual manner of family settlements in England, There is not a word said in this deed of any provision for any of the daughters, in consideration of marriage; nor does it appear that any marriage was in contemplation at that time ; and such a contingency is only looked to as a possible event equally applicable to every member of the family, in the usual manner of all instruments of a similar nature, making a general provision for a family. Some time after the execution of this deed, and previous to any revocation, a marriage took place between the Chevalier Vandersmissen and a daughter of Admiral Graves ; but at what time does not appear. The deed of trust, therefore, cannot be considered as a marriage contract, any more than any other deed Snaking general provision for a family. And if it was void in its creation, it could not change its character by a subsequent marriage of one of the daughters, which was not in contemplation at the time, and which does not appear to have taken place with any reference to that deed. Nor does it appear that it was even known to either of the parlies, that such a deed existed. That deed must, therefore, be considered as purely voluntary, and can derive no support from the marriage. Besides, it created no obligation on the parties, because containing a power of revocation,they might, at any time, defeat all the provisions of it.
On the 17th June, 1817, which appears to have been after the marriage of the Chevalier Vandersmissen, a covenant was entered into on the part of Admiral Graves and wife, reciting that the marriage had taken place, and that previously thereto, and in contemplation of the said marriage, it was agreed that a settlement out of the estates in South Carolina, to the amount of six thousand pounds, with interest at five per cent., should be made on them, by Richard Graves and wife, &c.
Now the questions growing out of this part of the case, are— 1st. Whether this being a post nuptial settlement, is entitled to a preference over antecedent creditors. And, secondly, whether the-recital in the deed is to be received as evidence of a previous marriage contract, so as to give it the effect of an ante-nuptial settlement.
With regard to the first, I take it to be now clearly settled, that a post nuptial settlement, founded on no other consideration than marriage, is to be considered as voluntary, and to be governed by all the rules applicable to other voluntary settlements.
*241 The question, therefore, is again brought up, what degree of indebtedness will render a voluntary deed void against creditors. On th;,»: subject I have but little to add to the remarks which have ah re-dy been made, and to refer to the cfeoes which have already bean relied on. The position which I lay down, is, that a crédi-to ■- is always entitled to tiro property of his debtor, in preference to a volunteer. Or in other words, that a roa.: deeply in debt, cannot, by a gratuitous gift of his property, defeat the just demands of his bona fide creditors. I do not mean to question the validity of the gift, nor the right of file donee, to enforce the payment of it as against the donor ; but merely to contend that the creditor is entitled to a priority. Nor docs it appear to me necessary, in this case¿ to go into the enquiry, wlw.t degree of indebtedness shall be required to affect a voin-itory deed'. For if the estate of the donor is so ample, that the security of the creditors is not weakened, the question cannot arise ; and if it is not, I apprehend there cannot be any question which ought to prevail. In this case, all the property of which Admiral Graves was possessed at the time the settlement was made, is still at the disposal of his creditors, if they are entitled to a preference over these voluntary settlements. And as between bona fide creditors and volunteers, ¡here surely can bo no question which ought to run the risk of the casual fluctuations in the value of property. It would appear to me, therefore, that there can be no doubt from this view oí the case, but that the complainant^ are entitled to a priority, it will he observed that I have hitherto considered this question, as if all the property belonged to Admiral Graves. But it ¡.'ill be racollectedj as has already been observad, that the real cítate was the property of Mrs. Graves, and not liable for the debts of the Admira). Sha had a right, therefore, to dispose of her estate to such uses as she thought proper. And. as this covenant was made by virtue of the power reserved over* her own estate, I think it ought to prevail to that extent; and it is only as to the personal estate, that I think the creditors are entitled to a preference.
1 come now to the second question growing out of this brand): of the case, to wit, whether the recital in the covenant is to be considered as evidence of a‘ pre-existing marriage contract. This question, from what has already been said, it will bo observed, can only relato to the personal estate. And in the consideration of it, it cannot be material whether tho pretended pre-existing contract be ir. writing or parol, as the simple question is, whether the recital-in the subsequent deed be evidence oí either. If it cap. be re» *242 ceived as evidence of the existence of such a prior contract, it may then become important to enquire whether it were in writing or parol. On this subject, the cases do not appear to be numerous, There are a number of cases where the question has arisen, whe. ther a written or parol ante-nuptial contract shall be such a foundation of a subsequent settlement as to support it against crediors. Livingston vs. Read, 3 Johnson’s C. 488. Dundas vs. Datens, 1 Ves. J. 196. Atherly, 149. Rawdal vs. Morgan, 12 Ves. 74.
But in all those cases, the question seems to have been, whether the subsequent written agreement shall give such support to the prior parol contract, as to render it valid, and not whether it should be received as evidence of its existence. In the case of Battersbeo vs. Farrington, 1 Swanston, 112, the master oftho rolls says, “I ap. prehend that against all persons claiming under the settler, the re. cital is conclusive ; but it would be difficult to maintain, that a re. cital in a post nuptial settlement of ante-nuptial articles, of the exis. tence of which there is no distinct proof, would be binding on ere» ditors. And reference is made lo Ford vs. Guy, 1 Salk. 285, Marchioness of Annandale vs. Harris, 2 P. W. 432; and Shelby vs. Wright, Willis, 11, 12. Such a doctrine, it is observed, would give to every trader a power of excluding his creditors, by a reci. tai in a deed to which they are not parties.” Now, although that question was not necessary to the decision of the case, there is so much good sense in the remark, and it is so consistent with the general principles of the law of evidence, that I cannot withhold from it my assent. I think, therefore, that although the recital may be good evidence as between the parties, it cannot affect the creditors. I am obliged, therefore, to consider this a post nuptial settlement, and of course, voluntary and void, as to creditors ; and that the complainants are entitled to a preference out of the personal estate. I do not, however, consider this part of the case as entirely free from difficulty, and would, willingly, have supported the claim of Vandersmissen, if, upon any principle of law, i could have found myself authorised to do so. If the provision in the trust deed of 1815, had been an unconditional grant for the use of the daughter, without any power of revocation, and the marriage had afterwards taken place in consideration of such pro. Vision, it might, perhaps, have been supported. But there is no evidence that Vandersmissen ever knew that such a deed existed, and even if he had, when it is recollected that it was a mere gratuity which might he defeated at any time by a revocation, it does *243 not appear to me to be a claim of such a nature as to be entitled to a preference over a bona fide creditor.
There is another view of the ca&'e, which, at one time, excited some doubt iu my miad. There is reason to believe, that when the deed of 1617 was made, the estate was sufficiently ample to have satisfied the claims of both these parties. It struck me, as doubtful, whether the contingent interest which Vandersmissen had thus acquired, was not such a consideration as would entitle him to the benefit of the contract made with S. C. Graves, and allow Graves the benefit of the contract with him. But it will he perceived that that could apply only as between the parties. S. C. Graves was well acquainted with all the transactions, for he undertook to fulfil the contract. And if Vandersmissen himself, was not originally entitled to priority, he could not strengthen his claim by changing the character of his contract. And if any loss has resulted by. delay, it has been as much his fault as that of the complainant, and the priority of the creditor will still be preserved.
It is said that the recital in the deed must have relation to the trust deed. But it does not appear to me, that it will admit of that construction; because it professes to relate to a contract made previously to, and in contemplation of, the said marriage. Now, then, there is nothing in the trust deed from wheuce it can be inferred that such marriage, or indeed any marriage, was then ire contemplation. It also, in many respects, varies from that deed ia its provisions. It must, therefore, relate to some other contract, the existence of which we have no proof. But admitting it to relate to that deed, if it was originally voluntary, and not made ire contemplation of marriage, it is at least doubtful, whether the sub. sequent covenant could change its character. It must, therefore, Still be considered, as it regards the complainants, as a post nuptial settlement.
It still remains for us to determine the extent of the lien of Van-dersmissen on the real estate, and to adjust the respective priorities between all the parties. The terms of the deed are, that Admiral Graves and wife should convey to Vandersmissen and wife, in lieut of six thousand pounds sterling, laud to the value of three thousand pounds, and negroes' to the value of three thousand pounds, ac. cording to a valuation by two indifferent persons, one to be chosen by each.” Persons were appointed according to the provisions of the deed who did proceed to designate certain negroes by name and value ; and also to set' a value upon the land, by which the cumber of acres might be ^ascertained. Which valuations or as *244 signments are annexed to, and constitute a part of the deed. The lands and negroes, so designated, were afterwards conveyed by Vandersniissen and wife, to 8. C, Graves, and taken back by way of mortgage, in order to secure the payment of the said sum of six thousand pounds. So that I am of opinion the lien of Van-dersmissen can extend only to the lands and negroes thus specifically designated. He may have a claim in common with the other creditors of S. C. Graves, for the balance of bis debt, if the land mortgaged shall not be sufficient to pay the whole; but he can have no lion beyond the property so specifically pledged.
But even if no valuation had ever been made, and Vandersniissen •and wife had never conveyed to S. C. Graveo, the result would have been the same, ft is manifest, that Admiral Graves and wife intended to convey to Vandersmissen and wife such part of the land only as would have amounted to three thousand pounds, according to its value at that time. This is not only apparent from, the deed itself, but it may be inferred from the fact, that a valuation actually did take place by the agent of Vandersmissen and wife, and -from the further fact, that the negroes wore actually divided, according to the valuation then made. And it is probable that the land would have been divided, and set off to them, but for the contract with S. CJ. Graves. And it is perfectly reciprocal, for if it had risen in value, they would have had the benefit of it. Any other construe-iion would go to defeat all tbo other provisions of the deed. For the fee simple of the Barony would do little more now than satisfy their claim.
The conclusion, therefore, to which I have come, from' the different views which I have been able to take of the whole case, is, that the marriage settlement of Samuel C. Graves is void, so far as it goes to defeat the rights of Vandersmissen and wife under the marriage settlement's or to defeat the rights of the complainants, as creditors. That it is void on two grounds, 1st — -As including all the property that he possessed ; and 2d — As including all the negroes of his father, to which he had no right. But as it appears, that he received about ten thousand dollars of the property belong, ing to his wife, over and above what was contained in the settlement of her estate, l think the settlement ought to stand as a secu. rity for that sum, whatever it may be, for the reasons which have already been given. For as the wife does not appear to have participated in his fraud, she ought not to be a sufferer by her confidence.
I am also, further of opinion, that the settlement on Vaiiders- *245 jnissen and wife, ought to be supported, so far as he has a lien oa the land, even against the creditors, as being the property of Mrs. Graves, and not liable for the debts of her husband. But that it ia void as to the personal estate, against the creditors of Admiral Graves, though good as against S. C. Graves, as far as he gave a specific lien upon it.
All the deeds in question, therefore, must be set aside, so far as .is necessary to effect the objects of this decree, and the lands and negroes be sold to satisfy the claims of the respective parties, upon such terms as they may agree, or the Court of Equity may direct.. That the proceeds of that part' of the land, which is specifically mortgaged to Vandersmissen and, wife, be first paid and secured to the uses of the marriage settlement between them ; that out of the remaining proceeds of the lands the amount due to Mrs. Cleary, be secured to her in such manner as the Court of Equity may direct, and that it be referred to the master or commissioner, to ascertain the ¿mount. That the proceeds of the sale of the negroes, except those specifically pledged to Vandersmissen and wife, be applied to the satisfaction of the complainant’s debt; and if that shall not bo sufficient to satisfy the same, that the remaining proceeds of the land be applied to the same object, or so much thereof us shall be necessary for that purpose. And if the whole shall not be suf. ficient, that then the proceeds of the negroes pledged to Vanders. missen and wife, be applied to the satisfaction of the same. But if the proceeds of the land shall be sufficient for that purpose, that then the proceeds of the sale of the said negroes, be paid or applied to the úse of the said Vandersmissen and wife, according to the provisions of the marriage settlement with them ; and that the case bo roferred to the Court of Equity, to see this decree carried into effect, according to the principles herein established ; and that the costs be paid out of the estate.
It has been suggested, that there are other parties not yet before the court, who have higher claims to this property, than the parties to this bill. In answer to'that, I can only say, we determine the rights of those only who are before us, The rights of others, as a matter of course, are reserved.
I am aware that I have omitted various important views of which this case is susceptible ; but it appeared to me that they would all have lead to the same conclusion. I have, therefore, in order to avoid any greater perplexity, concluded my remarks, which have already extended to a tedious and tiresome length.
ABRAHAM NOTT.
I concur.
DAVID JOHNSON.
*246 Filed 25th April, 1828.
MV. Justice Colcock, though arriving at his conclusion, by s. very different process of reasoning, concurred with his brethren in ■ the result of their deliberations as to the land, but not as to tho negroes.